United States Court of Appeals,

Fifth Circuit.

No. 91-6372.

Doug DALTON, et al., Plaintiffs-Appellants,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Houston Commerce
Bank f/k/a Western Bank-Downtown, Defendant-Appellee.

Doug DALTON, et al., Plaintiffs-Appellants,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Etc., Defendant-Appellee.

April 14, 1993.

Appeals from the United States District Court for the Southern District of Texas.

Before REAVLEY, KING, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

In this appeal we review one district court's grants of summary judgment in two separate cases, consolidated for trial and for appeal, involving several of the same parties; namely, Plaintiffs-Appellants Doug Dalton and various associated individuals and partnerships (collectively, Dalton), and Defendant-Appellee the Federal Deposit Insurance Corporation (FDIC). Both summary judgments were granted in favor of the FDIC. Finding that the district court improperly denied Dalton's motion to remand one of the two cases (the primary case) to state court, we reverse and remand that action to the district court with instructions to remand it to the state court. But finding no reversible error in the district court's grant of summary judgment in the other case (the secondary case) we affirm that ruling.

I

FACTS AND PROCEDURAL HISTORY

A. *The Primary Case—the Dalton Note*

In March 1986, Dalton as maker signed a promissory note (the Dalton note) to evidence an

initial loan and future advances contracted for with Western Bank-Downtown (the Bank).[1]  The proceeds of the loan were to be used to construct an office building.  The Bank was obligated to advance Dalton funds for the project in accordance with a construction loan agreement that was one of the documents in the loan package.

During the course of construction, the Bank's parent bank failed.  The Bank was thus unable to advance the funds needed by Dalton to continue with construction.  As a consequence of the Bank's inability to continue the funding of the construction loan, asserts Dalton, he was unable to continue with construction.  That in turn caused him to lose potential tenants and made it impossible for him to repay his accrued obligations on the Dalton note.

In January 1988, Dalton filed a breach of contract suit against the Bank in Texas state court for failing to provide funding for the construction project.  Before it answered the lawsuit, however, the Bank was declared insolvent by the Texas Banking Commissioner, and the FDIC (which insured the Bank) was appointed receiver.  The FDIC-Receiver filed an answer in the state court proceedings on April 20, 1988.  In addition to answering Dalton's complaint, the FDIC counterclaimed for the indebtedness on the Dalton note.  Dalton filed an amended complaint on April 25, 1988, naming FDIC-Receiver as the proper party defendant.

In December 1989—more than a year-and-a-half after the FDIC entered the state court litigation—FDIC-Receiver assigned its interest in the Dalton note (and thus its interest in the litigation) to FDIC-Corporate.  Then, in January 1990, FDIC-Corporate removed the case to federal court.  Dalton sought to have the case remanded to state court as untimely removed, asserting that the period during which the FDIC could have removed the case to federal court had expired thirty days after FDIC-Receiver had been appointed and received notice of the lawsuit.  The district court denied Dalton's remand motion, holding that the case had again become subject to removal when FDIC-Corporate was substituted as a party for FDIC-Receiver.

In April 1991, the primary lawsuit was consolidated with the secondary lawsuit, which we

---

[1]At some point before the FDIC was appointed receiver, Western Bank became known as Houston Commerce Bank.  As it is not important to the disposition of this appeal, we will not belabor this point.

discuss below.  In October 1991, the district court granted summary judgment in favor of FDIC-Corporate on the Dalton note indebtedness.  The judgment was in the principal amount of $2,833,755.28, plus accrued interest of $1,117,930.69 and future interest to accrue at $1,397.47 per day.  At the same time, the court dismissed all of Dalton's claims connected with the Dalton note, holding that they were barred by § 1823(e) of FIRREA.[2]

B. *The Secondary Case—the Ten Park Ten Note*

In September 1986, Dalton as a general partner of two limited partnerships in which some of the limited partners were also investors in the first group (Dalton and the two new limited partnerships are hereafter referred to collectively as Dalton), executed another promissory note (the Ten Park Ten note).  This note evidenced funds loaned and to be loaned by the Bank for a development project unrelated to the office building.  The Ten Park Ten note was secured by an "assignment of profits agreement" and the personal guarantees of Dalton and a Mr. Lightfoot who was a participant in both the office building venture and the Ten Park Ten venture.

Dalton defaulted on the Ten Park Ten note on October 1, 1987.  Over three years later, on October 19, 1990, FDIC-Receiver filed suit (the secondary case) in federal court on this indebtedness.  In April, 1991, the secondary case was consolidated with the primary case.  In the secondary case, summary judgment was granted in favor of the FDIC at the same time that judgment was granted in the primary case on the Dalton note.  The judgment in the secondary case was in the principal amount of $454,719.52, plus accrued interest of $185,698.17 and future interest to accrue at $112.12 per day.

C. *Common Elements of the Two Cases*

Two of individuals who participated in both ventures—Dalton and Lightfoot—were personal guarantors of both loans.  Also, several of the assets initially pledged as security for the Dalton note, and later cross pledged to secure the Ten Park Ten note,[3] were foreclosed on by the Bank.  It credited

---

[2]*See* 12 U.S.C. § 1823(e).

[3]Three certificates of deposit, totalling $400,000, and a parcel of land which eventually sold for $560,438.53.

the entire proceeds of foreclosure to the outstanding balance on the then-delinquent Dalton note, applying those proceeds first to accrued interest and then to principal. Dalton now asserts that these funds should have been applied to the Ten Park Ten deficiency instead.

In addition to granting summary judgment on the indebtednesses under the two notes, the district court granted the FDIC's motion for attorneys' fees on the notes. The court awarded the FDIC $27,000 in attorneys' fees and costs, but made no attribution of that sum between the two indebtedness.

II

ANALYSIS

A. *Standard of Review*

As we have reiterated ad nauseam, we review the district court record on appeal from a grant of summary judgment "under the same standards which guided the district court."[4] The standards we apply are set out in the Supreme Court trilogy of *Anderson v. Liberty Lobby, Inc.*,[5] *Celotex Corp. v. Catrett*,[6] and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*[7] Summary judgment is proper when no issue of material fact exists and the moving party is entitled to judgment as a matter of law.[8] In determining whether summary judgment was proper, all fact questions are viewed in the light most favorable to the non-movant. Questions of law are reviewed here, as they are in other contexts, de novo.[9]

B. *The Primary Case—the Dalton Note*

When the provisions of FIRREA and the applicable jurisprudence of this and other circuits are analyzed, no doubt remains that the FDIC enjoys a unique and powerful right to remove to federal

---

[4]*Walker v. Sears, Roebuck & Co.,* 853 F.2d 355, 358 (5th Cir.1988).

[5]477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[6]477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

[7]475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

[8]FED.R.CIV.P. 56(c); *see Celotex,* 477 U.S. at 323-25, 106 S.Ct. at 2553-54.

[9]*Walker,* 853 F.2d at 358.

court virtually any case to which it is or becomes a party, irrespective of the stage or posture of the litigation when the FDIC's substitution or intervention occurs.[10]  Nevertheless, the FDIC's right to remove, like that of any other litigant, must be exercised in a timely manner.

It was not a matter of timeliness, however, that prevented FDIC-Receiver from removing the primary case to federal court when—in April 1988—it became a party.  Rather, a jurisdictional exception to the FDIC's statutory removal power barred such removal.  Section 1819 of the Federal Deposit Insurance Act created federal jurisdiction for disputes involving the FDIC, thereby providing the statutory basis for the FDIC's right to remove cases from state court to federal court pursuant to 28 U.S.C. § 1441.  Section 1819 creates federal jurisdiction in all civil cases in which "the [FDIC] shall be a party" *except* in "any such suit to which the [FDIC] is a party in its capacity as *receiver* of a *State bank* and which involve[s] only the rights or obligations of depositors, creditors, stockholders, and such State bank under *State law*."[11]  Dalton's breach of contract claim and the FDIC's counterclaim on the indebtedness fell squarely within the then-current version of the "state law exception" to § 1819's grant of federal jurisdiction.[12]  Thus, no federal question jurisdiction existed on which the FDIC could predicate removal.

Subsequently, however, on August 9, 1989—more than a year after FDIC-Receiver became a party to the state court litigation—the primary case did become removable by the FDIC.  Effective that date, an amended version of § 1819 was enacted as part of FIRREA.[13]  That new version has been interpreted to limit the "state law exception" to cases in which *only* the *interpretation* of the law

---

[10]*See* 12 U.S.C.S. § 1819(b)(2) (Supp.1992);  *In re Meyerland Co.,* 960 F.2d 512, 519 (5th Cir.1992) (en banc) (stating that part of Congress' intent in enacting FIRREA was "to afford the FDIC every possibility of having a federal forum").

[11]12 U.S.C. § 1819 (Fourth) (1982) (emphasis added).

[12]*See FDIC v. Kasal,* 913 F.2d 487, 493 (8th Cir.1990), *cert. denied,* --- U.S. ----, 111 S.Ct. 1072, 112 L.Ed.2d 1178 (1991).

[13]The Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101-73, 103 Stat. 183.

of a particular state is necessary.[14]  Ever since the amended version of § 1819 became effective, the mere presence of a federal defense such as *D'Oench, Duhme* or § 1823(e), has been sufficient to extricate the case from the state law exception.[15]  As the primary case (the one on the Dalton note) comprised such federal claims, federal jurisdiction came into existence, ipso facto, on August 9, 1989, when the amended version of § 1819 became effective.  And as FDIC-Receiver had become a party to the case prior to that date, the case became removable for the first time on that day, and the timeliness clock for the FDIC's right to remove the case began to tick.

Most cases concerning removal by the FDIC after FIRREA's removal rules were enacted (and subsequently modified) involve the question whether the FDIC's time to remove began to run when it became receiver or when it was substituted as a party to the litigation.  We have held that the time

---

[14]*See Diaz v. McAllen State Bank,* 975 F.2d 1145, 1149-50 (5th Cir.1992).  The new statute provided, in relevant part:

> (2) Federal Court jurisdiction.
>
> (A) In general.  Except as provided in subparagraph (D), all suits of a civil nature at common law or in equity to which the Corporation, in any capacity, is a party shall be deemed to arise under the laws of the United States.
>
> (B) Removal.  Except as provided in subparagraph (D), the Corporation may, without bond or security, remove any action, suit, or proceeding from a State court to the appropriate United States district court.
>
> (C) Appeal of remand.  The Corporation may appeal any order of remand entered by any United States district court.
>
> (D) State actions.  Except as provided in subparagraph (E), any action—
>
> > (i) to which the Corporation, in the Corporation's capacity as receiver of a State insured depository institution by the exclusive appointment by State authorities, is a party other than as a plaintiff;
> >
> > (ii) which involves only the preclosing rights against the State insured depository institution, or obligations owing to, depositors, creditors, or stockholders by the State insured depository institution;  and
> >
> > (iii) in which only the interpretation of the law of such State is necessary,
>
> shall not be deemed to arise under the laws of the United States.

[15]*See Diaz,* 975 F.2d at 1149-50.

for removal begins to run "from the date the FDIC "is substituted as a party' (i.e. intervenes)."[16]  In the instant case, however, the FDIC was already a party when the amendment to the jurisdictional statute was enacted.

In *FDIC v. Loyd,*[17] our explicit holding was that for the removal clock to begin to run the FDIC had to be a party before the court (e.g., after becoming the receiver, the FDIC must be substituted or must intervene in the litigation).  Implicit in that holding is the assumption that the FDIC must have a legal basis for removing the case.  But in the primary case, the explicit requirement of *Loyd* was already extant;  it was the underlying assumption of the *Loyd* decision (i.e., a legal basis of jurisdiction on which to predicate removal) that fell into place on the effective date of FIRREA—August 9, 1989.

The general rule provides that when the right to remove becomes available for the first time during the pendency of state court litigation, a party having the right to remove has thirty days—counting from the day when that party would have reasonably ascertained availability of removal—within which to file a notice of removal.[18]  But ever since the 1991 amendment of § 1819, the FDIC has had ninety days to remove such cases even though the removal window for all other litigants has remained at thirty days.[19]  Applying that post-FIRREA amendment retroactively, as we are bound to do,[20] we see that the FDIC had ninety days counting from August 9, 1989, in which to

---

[16]*Id.* at 1147 (quoting 12 U.S.C. § 1819(b)(2)(B)).

[17]955 F.2d 316, 326-27 (5th Cir.1992).

[18]*See* 28 U.S.C. § 1446(b).

[19]12 U.S.C. § 1819(b)(2)(B), as amended by the Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102-242, 105 Stat. 2236, 2286, provides:

> (B) Removal.  Except as provided in subparagraph (D), the Corporation may, without bond or security, remove any action, suit, or proceeding from a State court to the appropriate United States district court *before the end of the 90-day period beginning on the date the action, suit, or proceeding is filed against the Corporation or the Corporation is substituted as a party.*

12 U.S.C.S. § 1819(b)(2)(B) (Supp.1992) (emphasis added).

[20]*See NCNB Texas Nat'l Bank v. P & R Invs. No. 6,* 962 F.2d 518, 519 (5th Cir.1992).

remove the primary case to federal court. Even with its new found ninety day period, however, the FDIC failed to file its notice of removal until January 1990, well past the expiration of that period.

The FDIC argues, and the district court agreed, that its removal period began to run in December 1989, when the FDIC-Receiver assigned the rights in the Dalton note to FDIC-Corporate. We agree with the FDIC's assertion of the tired analogy that it wears a different hat as FDIC-Receiver than it does as FDIC-Corporate. The precedent supporting this distinction is both uniform and overwhelming.[21] We disagree, however, with the FDIC's bootstrapping proposition that simply by thus changing hats, even well after its initial time to remove has expired, it acquires an additional opportunity to remove the case to federal court—the tautological "second bite at the apple."

The FDIC insists that, as the legal obligations of FDIC-Corporate and FDIC-Receiver are distinct, their interests in this litigation are different. Up to that point we do not disagree. Without citation to any statutory or jurisprudential authority, however, the FDIC next posits that when one incarnation of the FDIC is substituted for another during the course of litigation, those distinctly differing interests justify our affording the substituted incarnation of the FDIC a new opportunity to remove the case. But this overreaching interpretation put forth by the FDIC runs counter to the clear and unambiguous wording of the statute that creates federal jurisdiction for cases involving the FDIC. We therefore decline its invitation to concoct such a dual removal system out of whole cloth.

Section 1819(b)(2)(A) creates jurisdiction for cases in which "the Corporation [meaning the FDIC], *in any capacity,* is a party."[22] Congress has demonstrated that when it means to draw a distinction between the two capacities of the FDIC, it knows how to do so explicitly. For instance, the state law exception of § 1819 applies only "to ... the Corporation [again meaning the FDIC], in the Corporation's capacity as receiver."[23] By contrast, the removal statute makes no such distinction

---

[21]*See, e.g., Beighley v. FDIC,* 868 F.2d 776, 779 n. 7 (5th Cir.1989); *FDIC v. Condit,* 861 F.2d 853, 857 (5th Cir.1988).

[22]12 U.S.C. § 1819(b)(2)(A) (emphasis added).

[23]*Id.* § 1819(b)(2)(D)(i).

and thus applies to the FDIC in either capacity.[24]

In *FDIC v. Loyd,* we stated that the question to answer in determining when the removal period begins to run is, "when did the case first become removable by the FDIC?"[25] The question is not, as the FDIC would have us read it, "when did the case become removable by FDIC-Corporate?" or even "when did the case become removable by the incarnation of the FDIC that is currently before the court?"

Even though the two capacities in which the FDIC functions are treated as two distinct legal entities for many purposes, they nonetheless remain merely distinct parts of a single entity, "the Corporation"; and the subject statute affords "the Corporation" but one opportunity to remove the case to federal court. Jurisdiction attaches and the case becomes subject to removal when "the Corporation" becomes involved in the litigation. In the instant case, the receiver incarnation of the FDIC did not act timely to remove the case, as was its right. It matters not whether, in not timely removing the case, the FDIC made a conscious, possibly tactical, decision to refrain from removing or merely dropped the ball. Either way, we cannot stretch the statute to allow "the Corporation," merely by doffing one hat and donning the other, to recover its own fumble and run with the ball for an additional ninety days.

We conclude then that the district court erred as a matter of law by holding that the FDIC became entitled to an additional opportunity to remove the primary case when the FDIC's interest in the litigation was transferred from FDIC-Receiver to FDIC-Corporate. It follows that the district court's denial of Dalton's motion to remand was error. We therefore vacate that part of the court's grant of summary judgment on Dalton's remand motion; and we remand the primary case to the district court with instructions that it in turn remand that action to the state court.

C. *The Secondary Case—the Ten Park Ten Note*

_____

[24]Although 12 U.S.C. § 1819(b)(2)(B) provides that "the Corporation," not "the Corporation, in any capacity," can remove the case to federal court, the FDIC does not—and could not—assert that the FDIC-Receiver could not remove the case to federal court. *See, e.g., Diaz,* 975 F.2d at 1146, 1148.

[25]955 F.2d at 326.

As we have observed, the district court granted summary judgment on the Ten Park Ten note at the time that it disposed of the primary case on summary judgment. Virtually all of Dalton's arguments in its briefs to this court dealt with the Dalton note and the primary case issues. In contrast, Dalton advanced virtually no direct argument concerning the Ten Park Ten note, generally grafting its Ten Park Ten discussion onto the arguments regarding the Dalton note.

The essence of Dalton's sparse Ten Park Ten argument, as we read it, is that the affidavit presented in the FDIC's summary judgment evidence was inadequate because 1) the affiant (an FDIC account officer) did not have personal knowledge of the loan, 2) the financial records addressed in the affidavit were otherwise inadmissible, and 3) the affidavit did not include as attachments sufficient sworn and certified bank records. Clearly Dalton's first argument fails. We have recently held, in *RTC v. Camp,* that an affidavit of an FDIC account officer is not defective solely because the officer did not have personal knowledge of the loan transaction when it occurred, and only learned about the loan after the bank went into receivership.[26] As we noted in *Camp,* "[a]ppellants would have us hold [the receiver] to a standard so strict that summary judgment would be all but impossible for plaintiffs in cases such as these. This would be contrary to our previous jurisprudence[, which provides] that "suits on promissory notes provide fit grist for summary judgment mill.' "[27]

Dalton's second argument is that the affidavit was inadmissible because it violated Federal Rule of Evidence 1004—the best evidence rule. Dalton asserts that the FDIC's proof of the deficiency was inadequate because the FDIC was in possession of all of the documents that show payments made by Dalton and the precise amounts owed on the notes. Dalton cannot, however, use the best evidence rule to force the FDIC to produce the particular type of evidence of the loan that he would prefer. The FDIC was not trying to prove the truth of the factual contents of the bank's documentation; we agree that doing that would implicate the rule. Rather, it chose to prove the amount of the deficiency with an affidavit from an FDIC account officer. The district court was well

---

[26]*RTC v. Camp,* 965 F.2d 25, 29 (5th Cir.1992).

[27]*Id.* (quoting *FDIC v. Cardinal Oil Well Servicing Co.,* 837 F.2d 1369, 1372 (5th Cir.1988)).

within its discretion to accept that evidence.[28]

Third, Dalton claims that the affidavit was defective (and therefore inadmissible) "because the FDIC failed to attach or file sworn or certified copies of the unspecified records that form the basis of [the affiant]'s testimony." This argument is wholly without merit. Our review of the FDIC's affidavit (and amended affidavits) reveals that all necessary documents were attached. All of the loan and security agreements are included in the package, and Dalton's demand that each and every piece of paper that Wilson reviewed to determine the amount of the deficiency be attached to the affidavit is without any legal basis whatsoever.

D. *Disposition of Secondary Case if Different from Primary Case*

In response to an inquiry that we made during oral argument concerning the proper disposition of the secondary case if the primary case should be remanded to state court, Dalton submitted a letter arguing that the secondary case should be remanded to the district court for redetermination of the correct amount of the judgment on the Ten Park Ten note. Dalton asserts that the proper amount cannot be determined from the district court's opinion because that court "entered *one* judgment lumping together the amounts allegedly owed under both notes." This assertion is frivolous or worse; it evaporates in the face of even a casual reading of the record. In its October 22, 1991 disposition of the consolidated cases, the district court set out, in separate numbered paragraphs, the precise amounts owing under each note. As we find that the district court properly granted summary judgment on the evidence presented by the FDIC concerning Dalton's delinquency on the Ten Park Ten note, we affirm the district court's judgment on that note.

E. *Application of the Pledged CDs and Proceeds from the Sale of Secured Property to the Dalton Note's Deficiency*

In his supplemental letter to this court, Dalton also asserts that if the primary case is remanded to state court, the proceeds of foreclosure on the cross pledged assets should be credited to the indebtedness on the Ten Park Ten note. This bald, unsupported assertion amounts to little

---

[28]*See, e.g., United States v. Smyth,* 556 F.2d 1179, 1183-84 (5th Cir.) (holding that the district court was within its broad discretion in accepting a particular type of evidence), *cert. denied,* 434 U.S. 862, 98 S.Ct. 190, 54 L.Ed.2d 135 (1977).

more than a letter to Santa Claus. In 1988 when the proceeds from these assets were applied to the Dalton note it was in default. Both the Bank (which was not in receivership when the CDs were set off) and the FDIC (which was acting as receiver when the proceeds from the foreclosure on the property were applied to the indebtedness) acted fully within their rights under the security agreements in applying those amounts against the delinquency on the Dalton note. That call was theirs to make, not Dalton's.

Dalton cites no authority for his proffered proposition that the debtor under two notes has the option to direct to which of the notes secured by the encumbered property the foreclosure proceeds will be applied. Moreover, if Dalton were to emerge victorious on the merits of his breach of contract claim in the state court to which the primary case is ultimately remanded,[29] nothing would bar his recovering from the FDIC—whether directly or by credit to the Ten Park Ten debt—the amount of the foreclosure proceeds applied to the Dalton note debt by the Bank and the FDIC.

F. *Attorneys Fees*

The final issue we review is that of attorneys fees. Following oral argument, we requested counsel to advise us on all ramifications of a remand of the primary case to the state court, but we heard nothing from counsel for either party concerning attorneys fees. We therefore consider that issue ex proprio motu.

The district court awarded the FDIC a single sum of $27,000 as attorneys' fees for the entire consolidated litigation. The court made no attribution of such fees between the two cases. Neither did the FDIC in its affidavit supporting its request for attorneys fees (which was uncontradicted by Dalton) address the allocation of attorneys fees between the primary and secondary cases. Having found that the district court did not have jurisdiction over the primary case because it was improperly removed, it follows, per force, that the district court did not have jurisdiction to award attorneys fees for the FDIC's litigation in connection with that note. The issue of attorneys fees for collection of the primary note will properly be before the state court on remand.

---

[29]We make no prediction that any such result will occur in the state court. The FDIC will, after all, have at its disposal the same arsenal of doomsday weapons—*D'Oench, Duhme* and § 1823(e)—in state court as it had in the district court.

We do find that the district court properly granted attorneys fees for the second case. We are unable, however, from either the district court opinion or the summary judgment evidence, to divine exactly what the amount of that award was or should have been. We therefore include the attorneys fees issue in our remand to the district court, for the limited purpose of parsing its original fee award and assigning the portion properly attributable to the secondary case.

III

CONCLUSION

The district court erroneously allowed the FDIC to remove the primary case to federal court. The FDIC's time to remove had expired when it sought and obtained removal; and nothing in FIRREA gives the FDIC a second opportunity to remove the case simply by changing from its receiver horse to its corporate horse in midstream of ongoing litigation. The district court's decision on the primary case is therefore reversed and that case is remanded to the district court with instructions further to remand the case to state court. But, agreeing fully with the district court's grant of summary judgment in favor of the FDIC in the secondary case (on the Ten Park Ten note), we affirm that holding.

We also remand the issue of attorneys fees to the district court. Once the district court determines how much of its original $27,000 award is attributable to the secondary case, that amount should be awarded to the FDIC. The issue of the attorneys fees (if any) to be awarded in the primary case, however, accompany that case on remand to the state court.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.